AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises and vehicles as described in Attachments A-1<br>through A-6 | )<br>)<br>)<br>)<br>)<br>)   Case No.    '19 –MC– 68(A-F) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

as described in Attachments A-1 through A-6 hereto,

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of Methamphetamine and Heroin |
| 21 U.S.C. § 843(b) | Conspiracy to Distribute |
| 21 U.S.C. § 846 | |

The application is based on these facts:

See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeffrey Thomas, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at _3:34_ a.m./p.m. *(specify reliable electronic means)*.

Date: _1-31-19_

_____
*Judge's signature*

City and state:  Portland, Oregon

John V. Acosta, United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is located at **18850 SW Farmington Road, Apartment 23, Beaverton, Oregon** ("**Apartment 23**"). **Apartment 23** is further described as a multi-family residential apartment complex located on the south side of SW Farmington Road, the residence is beige in color with green trim. The front door appears to be beige in color and faces towards the west. On the face of the door, the numbers, "23," are affixed to the door and run horizontally.



## ATTACHMENT A-2

### Property to Be Searched

The property to be searched is located at **13905 SW Hazel Street, Beaverton, Oregon** ("**Hazel Residence**"). **Hazel Residence** is further described as a two-family duplex home located on the north side of SW Hazel Street, the residence is white in color with white trim. The residence is the eastern most unit on the right side of the duplex. The front door appears to be white in color and faces towards the south. On the southern face of the home, the numbers, "13905," are affixed to the trim and run horizontally to the right of the front door. The backyard area behind 13905 SW Hazel Street and the adjacent unit are separated by a fence distinguishing the two properties. Within the backyard and on the curtilage of 13905 SW Hazel Street is a storage shed and this is included in the area to be searched.



**Attachment A-2**                                              **Page 1**

## ATTACHMENT A-3

### Property to Be Searched

The property to be searched is a **2007 gray Toyota Camry, Oregon license plate**

**9W4347, vehicle identification number (VIN): 4T1BE46K77U015944** (the "Gray Camry")



## ATTACHMENT A-4

### Property to Be Searched

The property to be searched is a **2011 white Ford F-150, Oregon temporary tag P275770 and vehicle identification number (VIN): 1RTMR1CM2BKD53397** (the "White Ford").



**Attachment A-4**                                                      **Page 1**

**ATTACHMENT A-5**

**Property to Be Searched**

The property to be searched is a **2007 red Honda Accord, Oregon license plate 513KWP, vehicle identification number (VIN): 1HGCM568X7A221882** (the "**Red Accord**").



**Attachment A-5**                                                          **Page 1**

## ATTACHMENT A-6

### Property to Be Searched

The property to be searched is a **2009 green Chevrolet Malibu, Oregon license plate 539LBL, vehicle identification number (VIN): 1G1ZK57B39F233136** (the "**Green Malibu**").



## ATTACHMENT B

### Items to Be Seized

The items to be searched for, seized, and examined, are those items on/in the premises and vehicles described in Attachments A-1 through A-6, that contain evidence, contraband, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 843(b) and 846.  The items to be seized cover the period of September 2013 through the date of the execution of the search warrant.

1.      The items referenced above to be searched for, seized, and examined are as follows:

a.      Controlled substances, including but not limited to methamphetamine and heroin held in violation of 21 U.S.C. Sections 841(a)(1) and 846;

b.      Firearms and other dangerous weapons and ammunition;

c.      Financial profits, proceeds and instrumentalities of trafficking in narcotics and money laundering, including U.S. Currency and other items of value;

d.      Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutants such as inositol, vitamin B12, etc.;

e.      Books, records, receipts, notes, ledgers, and other documents relating to the manufacture and distribution of controlled substances; money laundering, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits;

f.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture, importation and distribution of controlled substances, and money laundering;

g.     Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and receipts, account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

h.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

i.     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel [(if issuing court requires a date range, it is suggested that you use either the statute of limitations or the date on which your conspiracy began) purchased/acquired between DATE and the present];

j.     Cellular telephones, computers and other electronic devices capable of storing data that constitutes evidence or the instrumentality of drug dealing.

k.     Latent prints and identifying material from items at the Subject Residence.

**Page 2 – Attachment B**                              **USAO Version Rev. June 2017**

2.      As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant and any computer, storage medium, or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter "Computer"):

    a.      Evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

    b.      Evidence of software that would allow others to control the Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c.      Evidence of the lack of such malicious software.

d.      Evidence indicating how and when the Computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the Computer user.

e.      Evidence indicating the Computer user's state of mind as it relates to the crime under investigation.

f.      Evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence.

g.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computer.

h.      Evidence of the times the Computer was used.

i.      Passwords, encryption keys, and other access devices that may be necessary to access the Computer.

j.      Documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the Computer.

k.      Records of or information about Internet Protocol addresses used by the Computer.

l.      Records of or information about the Computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m.      Contextual information necessary to understand the evidence described in this attachment.

### Search Procedure

4.      The search for data capable of being read, stored, or interpreted by a computer or storage device, may require authorities to employ techniques, including imaging any computer or storage media and computer-assisted scans and searches of the computers and storage media, that might expose many parts of the computer to human inspection in order to determine whether it constitutes evidence as described by the warrant.

5.      The initial examination of the computer and storage media will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant. The government shall complete this review within 180 days of the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

6.      If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the computer and storage media do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

7.      If an examination is conducted, and the computer and storage media do not contain any data falling within the ambit of the warrant, the government will return the computer and storage media to its owner within a reasonable period of time following the search and will seal any image of the computer and storage media, absent further authorization from the Court.

8.      The government may retain the computer and storage media as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the computer and storage media and/or the data contained therein.

9.      The government will retain a forensic image of the computer and storage media for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

DISTRICT OF OREGON     )

                             ) ss.   AFFIDAVIT OF JEFFREY THOMAS

COUNTY OF MULTNOMAH   )

### Affidavit in Support of an Application
### Under Rule 41 for Search Warrants

### Table of Contents

INTRODUCTION AND AGENT BACKGROUND ................................................... 1
SUMMARY OF PROBABLE CAUSE ................................................................ 4
INTRODUCTION ............................................................................................ 6
CONTROLLED PURCHASES OF HEROIN AND METHAMPHETAMINE ........... 9
IDENTIFICATION OF JORGE, LAMAS, and LIBERTY DRIVER ...................... 16
    Identification of JORGE ........................................................................ 17
    Identification of LAMAS ....................................................................... 17
    Identification of LIBERTY DRIVER ...................................................... 18
SURVEILLANCE of JORGE, LAMAS, and LIBERTY DRIVER ....................... 19
IDENTIFICATION OF RESIDENCES ............................................................. 36
    JORGE's Residence: Apartment 23 ..................................................... 36
    Hazel Residence – Suspected Drug Stash Location .............................. 37
IDENTIFICATION OF VEHICLES ................................................................. 38
    Gray Camry – JORGE's Car ................................................................ 38
    White Ford – JORGE's Truck .............................................................. 38
    Green Malibu – LAMAS' Vehicle ....................................................... 39
    Red Accord – Mobile Stash Location ................................................... 39
KNOWLEDGE BASED ON TRAINING AND EXPERIENCE .............................. 40
    Electronically Stored Information ......................................................... 42
CONCLUSION ............................................................................................. 49

I, Jeffrey Thomas, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am an "investigative or law enforcement officer of the United States" within the

meaning of Title 18, United States Code, Section 2510(7). I am currently employed as a Special

Agent with the Drug Enforcement Administration and have been since May of 2012. My current

assignment is with the DEA Salem Resident Office, investigating controlled substances crimes.

My training and experience includes completion of the sixteen (16) week DEA Basic Agent

**Affidavit of Jeffrey Thomas**                                  **Page 1**

Training course at the Justice Training Center in Quantico, Virginia. This training focused on the identification of controlled substances; how controlled substances are consumed; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the laws relating to the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations. I am familiar with investigations of drug trafficking organizations, including methods of importation and distribution of controlled substances. I have assisted with multiple investigations, including four wiretap investigations, and cases involving organizations trafficking several different controlled substances to include heroin, methamphetamine, cocaine and marijuana. These investigations have resulted in the seizure of controlled substances as well as United States currency and the prosecution of many defendants.

2.     I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the premises and vehicles described below, as further described in Attachment A hereto, for evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 843(b) and 846. As set forth below, I have probable cause to believe that such property and items, as described in Attachment B hereto, are currently located at/in the residences and vehicles (collectively, the "**Premises**") described below:

a.     **18850 SW Farmington Road Apt. 23, Beaverton, Oregon** (hereinafter, "**Apartment 23**");

b.     **13905 SW Hazel Street, Beaverton, Oregon** (hereinafter, the "**Hazel Residence**");

c.     **2007 gray Toyota Camry, Oregon license plate 9W4347** (the "**Gray Camry**");

**Affidavit of Jeffrey Thomas**                                                    **Page 2**

    d.      **2011 White Ford pickup truck, Oregon temporary tag P275770 and vehicle identification number (VIN): 1RTMR1CM2BKD53397 (the "White Ford");**

    e.      **2007 red Honda Accord, Oregon license plate 513KWP (the "Red Accord");**

    f.      **2009 green Chevrolet Malibu, Oregon license plate 539LBL (the "Green Malibu");**

    3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from my review of consensually-recorded calls and text messages to date; from oral and written reports of other law enforcement officers; and, from records, documents and other evidence obtained during this investigation. I have obtained and read official reports prepared by law enforcement officers participating in this investigation.

    4.      As set out herein, there is probable cause to believe that the following offenses have been committed and are being committed by Jorge Luis Ortiz-Perez (hereinafter, "JORGE"), Arturo Lamas-Villarreal (hereinafter, "LAMAS"), FNU LNU (hereinafter, "LIBERTY DRIVER"), and others:

    a.      Distribution of, and possession with intent to distribute heroin and methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A);

    b.      Use of communications facilities to commit, facilitate, or further an act or acts which constitute a felony in violation of Title 21, United States Code, Section 843(b); and

    c.      Conspiracy to commit the foregoing offenses, in violation of Title 21, United States Code, Section 846.

**Affidavit of Jeffrey Thomas**                                                  **Page 3**

## SUMMARY OF PROBABLE CAUSE

5.      This affidavit will describe an investigation involving three controlled purchases

of drugs.  In November and December 2018, agents conducted two controlled purchase of four

pieces[1] of heroin on each separate occasion utilizing a DEA confidential source (CS).  In January

2019 agents conducted the controlled purchase of approximately one pound of

methamphetamine.  All three purchases were arranged over the phone between CS and JORGE.

6.      We have identified JORGE as the controlled substances dispatcher for this

organization.   JORGE takes drug orders by phone and then directs couriers, such as LAMAS, to

deliver the controlled substances.  Through this investigation we have identified **Apartment 23**

as JORGE's primary residence.  Based on court authorized geolocation data for phones used by

JORGE combined with physical surveillance of JORGE, I believe that **Hazel Residence** is the

second most frequently visited location by JORGE.  Furthermore, I believe that the pound of

methamphetamine was obtained from the **Hazel Residence** immediately before it was delivered

by LAMAS to the CS in January 2019.  From this information, combined with other surveillance

conducted at **Hazel Residence** described herein, I believe that **Hazel Residence** is the primary

drug stash location for this drug trafficking organization (DTO).

7.      During this investigation we have seen JORGE operating three vehicles; **Gray**

**Camry**, **White Ford**, and **Red Accord**.  Based on surveillance of LAMAS, in conjunction with

suspected drug deals, I believe that **Red Accord** is used as a mobile drug stash location.  From

surveillance I know that LAMAS drove the **Green Malibu** when he delivered the drugs to CS in

---

[1] Based on my training and experience I know that a "piece" of heroin equals about 25
grams, a few grams short of an ounce.  I also know that a "piece" is a common unit of measure
for trafficking heroin.

**Affidavit of Jeffrey Thomas**                                                   **Page 4**

the December 2018 and January 2019 controlled purchases of heroin and methamphetamine, respectively.

8.     Based on my training and experience I know that drug traffickers commonly store evidence of their drug trafficking crimes at their residences and in their vehicles. Based on this knowledge I believe that evidence of the drug trafficking activities conducted by JORGE, LAMAS, and LIBERTY driver will be located at **Apartment 23**, **Hazel Residence**, as well as in **Gray Camry**, **White Ford**, **Red Accord**, and **Green Malibu**.

**Description of Confidential Source ("CS")**

9.     CS has provided information to law enforcement for several years. CS is providing information in exchange for monetary consideration and immigration benefits. I have personally worked with CS during multiple criminal investigations. Based on my experience with CS, I believe CS to be both credible and reliable.

10.     CS's criminal record shows 24 arrests that include: Resisting Arrest, Criminal Trespass, Driving While Suspended/Revoked, Failure to Pay Fine, Failure to Appear, Menacing, Harassment, Frequenting a Place Where Drugs are Sold, Possession of Cocaine, Driving Under the Influence of Intoxicants, Giving False Information, Domestic Menacing, Assault IV – Domestic, Probation Violation, Harassment – Domestic, and Theft II. Of those crimes for which CS has been arrested, CS has been convicted of the following: Driving While Suspended, Assault IV, Probation Violation, Harassment – Domestic, Possession of Cocaine, Harassment, Menacing, Resisting Arrest and Failure to Appear.

11.     DEA Salem (Oregon) Task Force Officer Eugenio Zuniga has spoken to CS regarding CS's arrest for Giving False Information to Police. CS reported that CS knew CS was driving with a suspended license and gave law enforcement a false name and date of birth, at

**Affidavit of Jeffrey Thomas**                                                                 **Page 5**

first, but eventually gave CS's true identity to officers.  Regarding the Theft II arrest, which involved CS stealing money from a wallet, CS reported that CS had been given an opportunity by a sheriff's deputy to report what had happened, at which time CS apparently lied.  A Marion County deputy later spoke to CS about the incident, at which time CS admitted to the theft. After a civil compromise, the theft charge was dismissed.

12.    During the past few years, CS has provided other officers and me with information related to several drug trafficking organizations operating in Oregon.  Officers have used information provided by CS to help develop evidence necessary for the arrests and successful prosecution of several defendants and the seizure of controlled substances and drug proceeds.

**INTRODUCTION**

13.    On November 9, 2018, agents used a confidential source (referred to herein as "CS") to order approximately four pieces of heroin from JORGE; an unidentified courier delivered the heroin in a vehicle that is not one of the subjects of this affidavit.  The heroin was exchanged for $3200.  Agents identified JORGE after the controlled buy when they obtained court authorized geolocation data for the phone the CS called to arrange the heroin buy.  Agents used geolocation data for JORGE's phone from several different locations to identify JORGE as the person that was consistently in the area where his phone was reported to be located and therefore the likely user of the phone.  The suspected heroin was sent to a DEA laboratory for analysis which determined heroin to be present in the material sold to CS.

14.    On December 13, 2018, agents used CS to order another four pieces of heroin from JORGE by phone, which was then delivered by LAMAS using the **Green Malibu** to make the delivery.  Agents identified LAMAS when he arrived to deliver the suspected heroin to CS in

**Affidavit of Jeffrey Thomas**                                                                                  **Page 6**

exchange for $3200. That suspected heroin was sent to a DEA laboratory for analysis and the results are pending. The suspected heroin purchased in December 2018 appeared the same and was packaged the same as the material purchased in November 2018, which tested positive for heroin. Based on my training and experience I believe the material purchased in December 2018 is also heroin.

15.     On January 18, 2019, agents used CS to order approximately one pound of suspected methamphetamine from JORGE; LAMAS again drove the **Green Malibu** to deliver the drugs to the CS. During the course of the transaction LAMAS was aided by LIBERTY DRIVER. Agents followed LAMAS and LIBERTY DRIVER as they traveled to the **Hazel Residence** where I believe, based on surveillance of his departure and my belief that he was holding an item consistent with a pound of methamphetamine, LIBERTY DRIVER obtained the pound of methamphetamine and brought it to LAMAS who was waiting in the **Green Malibu**. LIBERTY DRIVER returned to the **Hazel Residence** on foot and agents then followed LAMAS as he drove in the Green Malibu to the meet location where LAMAS delivered the pound of methamphetamine to CS in exchange for $2800. I field tested the suspected methamphetamine which resulted in a presumptive positive test for methamphetamine. The substance was sent to a DEA laboratory for official analysis. The results of that analysis are pending.

16.     On January 28, 2019, at the direction of officers, CS called JORGE to discuss future drug transactions andJORGE told CS that JORGE was expecting a new supply of drugs to arrive the following day, January 29, 2019.

17.     On January 29, 2019, agents tracked the **Green Malibu** and **Red Accord** departing the area of **Hazel Residence** and travelling to Woodburn, Oregon, and then return towards the Hazel Residence. As described in detail below, agents observed both vehicles return

**Affidavit of Jeffrey Thomas**                                        **Page 7**

to the Hazel Residence, JORGE and LAMAS conduct significant counter-surveillance, and LAMAS carry a backpack past the front door of **Hazel Residence** and disappear down the side yard of **Hazel Residence**. Based on these events, I believe that LAMAS and JORGE obtained a new supply of drugs and secured it at the **Hazel Residence.**

18.     During this investigation, officers have directed CS to exchange numerous calls and text messages with JORGE that I believe relate to drug trafficking. This affidavit describes recorded calls and text messages made between CS and JORGE. These communications are primarily in Spanish and have been interpreted and summarized by Task Force Officer (TFO) Zuniga, a native Spanish speaker. Subsequent review of recorded conversations and the preparation of final transcripts may reflect changes from the preliminary summaries and transcripts prepared by investigators. The conversations described below are not necessarily the entire conversations between the involved parties, and include pertinent portions of the conversations.

19.     I know through training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation with whom I have spoken, that individuals involved in the distribution of controlled substances and other criminal activity often use coded words and inferences when referring to illegal activity. I have used this training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, to evaluate what I believe to be an accurate interpretation of these coded words and inferences. My interpretations are described below and are indicated in parenthesis on occasion. The interpretations described herein are based on my review of intercepted communications, and from my discussions with other law enforcement officers familiar with this investigation.

**Affidavit of Jeffrey Thomas**                                                    **Page 8**

20.     During the investigation, we have conducted physical, electronic and/or covert video surveillance on many of the target subjects of this investigation. Officers have also received court-authorized geolocation data for telephones used by JORGE. Using these investigative techniques, officers have identified many of our target subjects' primary residences as well as vehicles they drive.

## CONTROLLED PURCHASES OF HEROIN AND METHAMPHETAMINE

21.     Prior to conducting the controlled purchases described in this affidavit involving CS, officers searched CS and his/her vehicle to ensure CS was not in possession of any drugs, weapons or significant sums of currency. Officers then outfitted CS with audio transmitting and recording devices and provided CS with DEA funds to make the purchase. During each of the controlled purchases, agents documented the serial numbers of the government funds used to purchase the controlled substances. Officers then maintained surveillance on CS and/or his/her vehicle until the operation was complete. Afterwards, officers searched CS and his/her vehicle a second time to ensure s/he did not possess any drugs, guns or significant sums of currency, other than the drugs purchased.

### First Heroin Buy – November 9, 2018

22.     On November 9, 2018, agents used CS to purchase approximately four pieces of heroin from JORGE and an unidentified courier. At the direction of agents, CS called JORGE at telephone 971-252-0261 (referred to as "Jorge Phone 1") to request four pieces of heroin. JORGE agreed to have someone deliver the four pieces of heroin to CS at the McDonald's restaurant in Woodburn, Oregon at noon the same day in exchange for $3,200. JORGE told CS that the courier would be driving a gray Toyota Camry.

**Affidavit of Jeffrey Thomas**                                                           **Page 9**

23.     Agents established surveillance in the area of the McDonald's in advance of the

12:00 p.m. meet time. The CS arrived at the McDonald's at 11:55 a.m. At 12:04 p.m. Det.

Roelof saw a gray Toyota Camry bearing Oregon license 680KUW arrive in the McDonald's

parking lot. This gray Camry is referred to herein as "680KUW Camry" to avoid confusion with

the **Gray Camry** operated by JORGE. At 12:05 p.m. Det. Roelof saw an unidentified Hispanic

male (herein "UM1") exit the driver's door of the 680KUW Camry and walk to the CS' vehicle

and enter its passenger side door. At 12:08 p.m. Det. Roelof saw UM1 exit the CS' vehicle and

return to the 680KUW Camry. Agent's followed UM1 to a gas station across the street from the

McDonald's and then followed as the 680KUW Camry traveled northbound on I-5.

24.     Following the meeting, TFO Zuniga and SA Hall followed the CS to a separate

location where CS turned over approximately four pieces of suspected heroin. The CS told

agents that the CS had given $3,200 in official funds to the courier in exchange for the four

pieces of heroin. The heroin was later sent to a DEA laboratory for analysis. The material tested

positive for heroin.

25.     Agents continued to follow UM1 and the 680KUW Camry north on I-5 to

Highway 217. Agents followed the 680KUW Camry northwest on highway 217 to the

Allen Road exit, then to Menlo Drive, and eventually to Hazel Street where the vehicle

parked about three houses east of **Hazel Residence** at 12:48 p.m. SA Otte drove down Hazel

Street and saw UM1 exit the 680KUW Camry and walk west towards the **Hazel Residence**. SA

Otte departed the area before he was able to identify UM1's destination. As described below,

later in this investigation we learned that **Hazel Residence** is a location frequented by JORGE

and his associates, and I believe that **Hazel Residence** was likely UM1's destination.

Surveillance was terminated a short time later.

**Affidavit of Jeffrey Thomas**                                                    **Page 10**

**Second Heroin Buy - December 13, 2018**

26.     On December 7, 2018, JORGE called the CS from telephone 458-234-1892 (hereinafter "Jorge Phone 2") and told CS that this was his new phone number. At the direction of agents, on December 13, 2018, at 11:34 a.m. CS called Jorge Phone 2 and requested to purchase four more pieces of heroin. JORGE agreed to have someone deliver the four pieces to CS at the Walmart in Woodburn, Oregon at 2:30 p.m. that day for $3,200. JORGE told CS that it would be a different courier making the delivery. At 1:58 p.m. CS called JORGE to confirm the deal and JORGE told CS that the new courier would be driving a Green Malibu.

27.     Agents followed CS to the Walmart in Woodburn where they arrived at 2:25 p.m. At 2:35 p.m. Detective Garland saw the **Green Malibu** arrive and park across the parking lot from CS' vehicle and identified the license plate for the Malibu to be Oregon 539LBL. Det. Garland saw that the **Green Malibu** was occupied by only the driver. At 2:38 p.m. Det. McCarley saw the **Green Malibu** travel across the parking lot and park near CS' vehicle. At that time Det. McCarley saw a Hispanic male, later identified as LAMAS, exit the **Green Malibu,** walk to and enter the passenger side of CS's vehicle. At 2:42 p.m. Det. McCarley saw LAMAS exit CS's vehicle and return to the **Green Malibu.** Officers followed the **Green Malibu** north bound on I-5 towards Portland. Surveillance of LAMAS and the **Green Malibu** continued and is described below. That surveillance led to the identification of the **Red Accord** as a mobile drug stash location, discussed below.

28.     Other agents followed CS away from the meeting with LAMAS and recovered eight plastic sacks of brown sandy material from CS. Based on my training and experience, this substance looked like brown heroin. Each sack was approximately one half piece for a combined total of four pieces and was packaged the same as the heroin purchased on November 9, 2018,

described above.  CS told agents that LAMAS gave CS the suspected heroin in exchange for the

$3,200 in U.S. currency supplied to CS.  Agents transferred the suspected heroin to a DEA

laboratory to be analyzed by chemists.  The results of the analysis are pending.

### Methamphetamine Buy - January 18, 2019

29.     In early January 2019, JORGE contacted CS and provided another new phone

number as 458-234-1407 (referred to herein as Jorge Phone 3).  Based on my training and

experience, it is common for those engaged in drug trafficking to change phone numbers

frequently to avoid detection and JORGE has followed this pattern.  On January 18, 2019, at

11:46 a.m. CS called JORGE at Jorge Phone 3 and asked if JORGE had any methamphetamine

available.  JORGE said that he did and that it was really good quality.  The two agreed to a price

of $2,800 for the pound of methamphetamine and planned to meet at the Walmart in Woodburn

at 12:45 p.m.

30.     I was conducting surveillance in the area of **Hazel Residence** before the call was

made to JORGE at 11:46 a.m.  Several minutes before the call I saw a male exit from the area of

the **Hazel Residence** and walk across the street and enter the driver's door of the **White Ford.**

The male fit the description of JORGE and although I could not see his face I believe it was

JORGE.  The male remained in the **White Ford** for several minutes then exited the vehicle at

11:52 a.m. and walked towards the **Hazel Residence** and out of my view.

31.     At 11:53 a.m., SA Carr saw that the **Green Malibu**, previously driven by

LAMAS during the second heroin buy, depart from the area of LAMAS' residence located at

3425 SW 178th Avenue, Apartment C in Aloha, Oregon (referred to as 178th Apartment).  Earlier

that morning, SA Otte observed LIBERTY DRIVER walk along Kinnaman Road and into the

parking lot of the apartment complex housing his primary residence, referred to herein as

**Affidavit of Jeffrey Thomas**                                                         **Page 12**

"Apartment 208." LIBERTY DRIVER walked out of SA Otte's view; however, moments later,

SA Otte observed the door to Apartment 208 open and close. At 11:57 a.m. SA Otte observed

the door to Apartment 208 open and seconds later observed LIBERTY DRIVER walk down the

stairs from the area of Apartment 208.

32.     At 11:58 a.m. SA Carr reported that the **Green Malibu** was traveling towards

Kinnaman Road and Apartment 208. Shortly thereafter, SA Otte observed the **Green Malibu**

pull into the parking lot of the complex housing Apartment 208. SA Otte had previously

observed LIBERTY DRIVER walk out of his view toward the common trash area in the parking

lot. Moments later, SA Otte observed the **Green Malibu** depart; however, SA Otte was not in a

position to maintain surveillance on the **Green Malibu** while it was in the parking lot.

33.     Agents followed the **Green Malibu** as it traveled to **Hazel Residence** where I

saw the **Green Malibu** arrive and park approximately three houses west of **Hazel Residence** at

12:09 p.m. I saw the passenger, LIBERTY DRIVER, exit the **Green Malibu** and walk across

the street and head east towards **Hazel Residence**. I saw LIBERTY DRIVER turn towards a

residence and then was out of my view. Immediately after that SA Otte drove past **Hazel**

**Residence** and saw LIBERTY DRIVER walking up the driveway towards the front door of

**Hazel Residence.**

34.     At 12:11 p.m. I saw LIBERTY DRIVER depart the area of **Hazel Residence** and

walk to the **Green Malibu** and enter the passenger side door. I clearly saw that LIBERTY

DRIVER was carrying something of weight and size in the front pocket of his coat. Based on

my knowledge and experience I believe that the outline of the item I saw carried in the front

pocket of LIBERTY DRIVER's coat was consistent with the size of a pound of

methamphetamine. I am familiar with methamphetamine and its different size quantities and

**Affidavit of Jeffrey Thomas**                                                              **Page 13**

methods of packaging. A pound quantity is a commonly sold and packaged amount and I have observed such packages on multiple occasions in my career. At 12:13 p.m. I saw LIBERTY DRIVER exit the passenger side of the **Green Malibu** and walk back towards **Hazel Residence**. At this same time I saw the **Green Malibu** depart traveling east on Hazel Street. Agents continued surveillance of the **Green Malibu** as it departed the area.

35.     Other agents followed CS to the Walmart in Woodburn where the CS arrived at 12:43 p.m. At 12:44 p.m. CS called JORGE on Jorge Phone 3 and told JORGE that the CS had arrived at the Walmart. JORGE told CS that the courier was driving **Green Malibu** and that the courier, later identified as LAMAS, had also arrived.

36.     Agents followed the **Green Malibu** from Hazel Street towards Woodburn, Oregon where SA Otte saw the **Green Malibu** exit I-5 south at the Woodburn exit (Hwy 214) at 12:44 p.m. SA Otte broke contact with the **Green Malibu** briefly as it traveled south from Highway 214 in the direction of the Walmart. Moments later, SA Otte observed the **Green Malibu** travel west on Stacy Allison Way and turn into the Walmart parking lot. Other officers maintained surveillance on the **Green Malibu** as it drove through the Walmart parking lot.

37.     At 12:48 p.m. SA Taulbee saw the driver, LAMAS, exit the driver's door of the **Green Malibu** and walk towards the CS' vehicle. TFO Zuniga and SA Taulbee monitored the meeting over the audio transmitting device with which officers had equipped the CS. TFO Zuniga and SA Taulbee heard the CS and LAMAS complete the drug deal and then saw LAMAS exit the CS' vehicle at 12:53 p.m. Det. Burke saw LAMAS walk from CS' vehicle and return to the **Green Malibu.**

38.     Immediately after the CS met with LAMAS, TFO Zuniga and SA Taulbee followed the CS away from the meeting and met with the CS at which time the CS turned over

**Affidavit of Jeffrey Thomas**                                                              **Page 14**

approximately one pound of suspected methamphetamine. The CS told agents that the CS had

given $2,800 in U.S. currency to LAMAS in exchange for the suspected methamphetamine.

Later, SA Taulbee and I field tested the suspected methamphetamine which resulted in a

presumptive positive test for methamphetamine. I saw that the size and shape of the suspected

methamphetamine was consistent with the outline of the item I saw in the pocket of LIBERTY

DRIVER's coat after he departed from **Hazel Residence**. The suspected methamphetamine was

then sent to a DEA laboratory for analysis. The results of that test are pending.

39.     At 12:54 p.m. Det. Burke saw the **Green Malibu** depart from the Walmart

parking lot. Agents followed the **Green Malibu** to the Arco gas station about a block

away. TFO Garrett saw LAMAS exit the **Green Malibu** and enter the convenience store. SA

Otte saw LAMAS as he stood outside speaking with an employee for several minutes. SA Otte

recognized LAMAS from previous surveillance operations and identified him by sight. Minutes

later, officers observed LAMAS depart the area in the **Green Malibu**.

40.     Agents followed the **Green Malibu** north on I-5 to Highway 217 to where the

**Green Malibu** exited from Hwy 217 onto Allen Boulevard west bound at 1:32 p.m. Agents

followed the **Green Malibu** west on Allen, then north on 141st where they lost contact a short

time later. Agents caught up to the **Green Malibu** as it proceeded to TV Highway and then to

the parking lot of the AutoZone at the intersection of 185th Avenue and TV Highway. Agents

then followed the **Green Malibu** to the Knecht's Auto Parts parking lot about a half mile to the

west on TV Highway. There SA Otte saw the **Green Malibu** parked in the lot at 1:53 p.m. At

the same time SA Otte saw the **White Ford** pickup that JORGE has previously been seen

operating departing from the Knecht's parking lot; however, SA Otte was unable to see the

occupants of either vehicle.

**Affidavit of Jeffrey Thomas**                                                          **Page 15**

41.     At 1:55 p.m. SA Otte saw the **Green Malibu** depart the Knecht's lot and then agents temporarily lost contact with the **Green Malibu**. TFO Garrett then saw the **Green Malibu** turn into Don Chilitos Mexican restaurant near 178th Avenue and TV Highway. I saw the vehicle parked there for a few minutes before it departed. Agents temporarily lost sight of the vehicle until SA Carr saw the **Green Malibu** arrive in the parking lot at 3425 SW 178th Avenue in Beaverton, Oregon (location of 178th Apartment) at 2:06 p.m.

42.     Several minutes later SA Carr saw LAMAS depart from the area of 3425 SW 178th and walk south on 178th and out of view. Agents remained in the area and at about 2:25 p.m. I saw LAMAS walking on 178th back towards his apartment. I drove by the apartments and saw LAMAS standing in front of an apartment part way down the side of 3425 SW 178th Avenue, where apartments "B," "C," and "D" are located; however, I could not determine the exact apartment. At 2:35 p.m. agents terminated surveillance of LAMAS.

### IDENTIFICATION OF JORGE, LAMAS, and LIBERTY DRIVER

43.     This section of the affidavit provides details regarding the identification of JORGE, LAMAS, and LIBERTY DRIVER. During the investigation, we received court-authorized geolocation data for three telephones used by JORGE. On several occasions, officers conducted physical and/or video surveillance in conjunction with receiving geolocation data and confirmed that the location and movements of JORGE were consistent with the location and movement of the respective cell phones. Additionally, agents conducted physical surveillance combined with court authorized GPS tracker data for vehicles utilized by LAMAS and LIBERTY DRIVER to assist in the surveillance and identification of these subjects and their residences.

**Identification of JORGE**

44.     This section of the affidavit provides examples of some of the surveillance as well as details of the traffic stop where JORGE provided a Mexican passport documenting his name and date of birth.  Officers have used court-authorized geolocation data in conjunction with physical surveillance to confirm that JORGE was the user of Jorge Phones 1, 2 and 3.  Additionally, officers placed a ruse phone call to Jorge Phone 2 while conducting surveillance of JORGE and observed him have a phone conversation contemporaneous with the ruse phone call.

45.     As described herein, agents utilized court authorized geolocation data for multiple phones used by JORGE to confirm that he was the person arranging the delivery of controlled substances to CS.  However, prior to January 2, 2019 we had not determined JORGE's name or any other identifiers for JORGE.  On January 2, 2019 agents conducted surveillance of JORGE as he was traveling in the **Gray Camry** in Beaverton, Oregon.

46.     I coordinated with the Washington County Sheriff's Office to have a marked patrol car initiate a traffic stop of **Gray Camry** for a traffic violation.  During that traffic stop SA Otte and I separately drove past the **Gray Camry** and visually confirmed that JORGE was the driver operating **Gray Camry.**  JORGE provided a copy of his Mexican passport identifying his full name as "Jorge Luis Ortiz Perez," with the date of birth of May 21, 1987, to Deputy Johnson during the traffic stop.  Deputy Johnson took photographs of JORGE's passport and those photos were later provided to me.  I confirmed that the photo in JORGE's passport was indeed JORGE.

**Identification of LAMAS**

47.     LAMAS was initially identified as a courier when he delivered four pieces of suspected heroin to CS on December 13, 2018.  On January 18, 2019, LAMAS delivered a

**Affidavit of Jeffrey Thomas**                                                                                          **Page 17**

pound of suspected methamphetamine to CS.  We have conducted surveillance of LAMAS on

several occasions and through physical and electronic surveillance, we have identified 178th

Apartment as LAMAS' residence.  We have also utilized court authorized GPS data from a

tracking device that was installed on LAMAS' car, the **Green Malibu,** to assist in our

surveillance of LAMAS.

48.    Based on surveillance and GPS tracker data for the **Green Malibu,** I believe that

LAMAS stayed at a Motel 6 in Beaverton, Oregon between January 7 and January 8, 2019.  At

my request, on January 9, 2019, Washington County Sheriff's Office Detective Betonte contacted

the motel staff where I believe LAMAS had stayed the night before and showed them a

surveillance photograph of LAMAS and his female companion.  The staff person recognized the

photo and was able to provide the name of "Arturo Lamas Villarreal" as the male that had rented

the room.  The staff person told Detective Betonte that LAMAS had provided them identification

with the name Arturo Lamas Villarreal; however, they did not have a copy of the identification.

49.    Det. Betonte reviewed motel security camera video of when LAMAS checked out

of the room on January 8, 2019, and confirmed that it was the driver of the **Green Malibu.**

Furthermore, the **Green Malibu** is also registered through the Oregon Department of Motor

Vehicles in the name "Arturo Lamas Villareal."

**Identification of LIBERTY DRIVER**

50.    LIBERTY DRIVER was identified while agents conducted physical surveillance

of JORGE, LAMAS, and the **Red Accord.**  We have not determined LIBERTY DRIVER's

name, but we have documented his person with photographs during several different surveillance

operations.  As described herein I believe that LIBERTY DRIVER is a co-conspirator with

JORGE and LAMAS in the distribution of controlled substances.  I believe that LIBERTY

**Affidavit of Jeffrey Thomas**                                                                                    **Page 18**

DRIVER provided the methamphetamine to LAMAS that LAMAS delivered less than forty minutes later, to CS on January 18, 2019. Furthermore, I believe there is probable cause that LIBERTY DRIVER helps facilitate the distribution of heroin by maintaining the **Red Accord**, the suspected drug stash vehicle.

51.     As described later in this affidavit, I believe that the **Red Accord** is used as a mobile drug stash location by this drug trafficking organization and I believe that LIBERTY DRIVER is responsible for keeping the **Red Accord** running, and operational. I believe that LIBERTY DRIVER is responsible for regularly starting the **Red Accord** to avoid a dead battery, for periodically moving the **Red Accord** to avoid it being towed or arousing the suspicion of neighbors and the interest of law enforcement. Furthermore, I believe there is probable cause that LIBERTY DRIVER is responsible for maintaining the supply of heroin in the **Red Accord** so that couriers, such as LAMAS, can obtain heroin from the mobile stash location as needed.

## SURVEILLANCE of JORGE, LAMAS, and LIBERTY DRIVER

52.     This affidavit describes recorded phone calls and text messages along with physical and electronic surveillance of the target subjects. The affidavit provides details regarding vehicles driven by some of the target subjects as well as residences and locations where the subjects reside and store drugs. The locations and vehicles that are the subject of this application are highlighted in **bold** font.

### Surveillance of JORGE and Gray Camry on December 4, 2018

53.     On November 19, 2018, United States Magistrate Judge John V. Acosta authorized the search of geolocation data for the Jorge Phone 1 (971-252-0261) used by JORGE to arrange the November 9, 2018 delivery of heroin to CS. The geolocation data was imprecise

for this phone.  However, it did lead to the initial identification of JORGE, the **Hazel Residence**, and the **Gray Camry** used by JORGE:

54.     On December 4, 2018, I established surveillance in the area of **Hazel Residence** in Beaverton, Oregon as the geolocation data reported that Jorge Phone 1 was located in the area.  I was also looking for the 680KUW Camry that was used to deliver four pieces of heroin to the CS on November 9, 2018.

55.     At 11:30 a.m. I saw **Gray Camry** arrive at the shared driveway for a duplex comprising addresses 13915, and 13905 SW Hazel Street (**Hazel Residence**).  I drove by **Hazel Residence** and observed the license plate for the **Gray Camry** to be Oregon 9W4347 and noted that the car was parked on the far right side of the driveway in front of house number 13905 (**Hazel Residence**).  The geolocation data for Jorge Phone 1 was imprecise but was located near **Hazel Residence** and the movement of Jorge Phone 1 was consistent with the arrival of **Gray Camry**.

56.     At 12:35 p.m. I saw the **Gray Camry** depart from **Hazel Residence** occupied by a single Hispanic male, later identified as JORGE.  I followed JORGE and the **Gray Camry** to a few different locations in Beaverton and, although imprecise, the movement of JORGE and the **Gray Camry** were consistent with the movements of Jorge Phone 1.  During this surveillance I took photographs of JORGE at various locations.

### Surveillance of LAMAS and LIBERTY DRIVER after 2nd Heroin Buy

57.     After the heroin buy on December 13, 2018, agents followed LAMAS in the **Green Malibu** north on I-5 to the rest stop just south of Wilsonville, Oregon where DEA Salem Resident Agent in Charge (RAC) Wolters saw it arrive at 2:55 p.m.  I saw LAMAS and a second Hispanic male, later identified as LIBERTY DRIVER, walking together towards the

**Affidavit of Jeffrey Thomas**                                                           **Page 20**

public restroom.  After they disappeared from my view I saw LIBERTY DRIVER walk away

from the area of the restroom then stand on the sidewalk appearing to wait for LAMAS.

58.     At 3:02 p.m. I saw LAMAS exit from the area of the restroom, then walk to

where LIBERTY DRIVER was standing.  The two men stood together conversing for a few

minutes before parting company and walking to their separate vehicles.  SA Carr saw LAMAS

walk towards **Green Malibu** and LIBERTY DRIVER walk towards a maroon Jeep Liberty

bearing Oregon license 475JYF (herein "Maroon Liberty").  I saw the Maroon Liberty depart

towards the exit of the rest stop then pull to the side and stop near the onramp to I-5 north.  I

watched as the Maroon Liberty waited until the **Green Malibu** pulled up behind the Maroon

Liberty and then they both merged on to I-5 traveling in tandem at 3:08 p.m.  This was the first

time we saw LIBERTY DRIVER and the Maroon Liberty during this investigation.

59.     Agents followed the **Green Malibu** and Maroon Liberty north on I-5 until the

**Green Malibu** exited east on I-205 and the Maroon Liberty continued north on I-5.  Surveillance

of Maroon Liberty was terminated at that time.

60.     Agents followed the **Green Malibu** east and north on I-205 to southeast Portland

where the **Green Malibu** parked on the 67th Avenue in Portland, Oregon near the intersection

with Boise Street at about 3:50 p.m.  SA Harron saw LAMAS exit the **Green Malibu** and walk

around the corner to where the **Red Accord** was parked on SE Boise Avenue.  SA Harron saw

LAMAS enter the driver's door of the **Red Accord** and sit for approximately a minute before

exiting the **Red Accord** and returning to the **Green Malibu** that was parked around the corner.

61.     SA Carr drove by the **Red Accord** and identified the Oregon license 513KWP.

SA Carr observed that the vehicle was legally parked and appeared to be operable.  I checked the

registration of the **Red Accord** and found it to be current and valid until August 23, 2020.  Most

**Affidavit of Jeffrey Thomas**                                                                                    **Page 21**

of the surveillance agents followed LAMAS and the **Green Malibu** away from the area but two agents maintained surveillance of the **Red Accord** to see if anyone else accessed the vehicle.

62.     After LAMAS departed from the **Red Accord,** agents followed LAMAS in the **Green Malibu** a couple of miles to the east where LAMAS parked the **Green Malibu** on the street near the intersection of SE 98th Avenue and SE Bush Street at 4:10 p.m.  SA Harron saw a pedestrian walk up and enter the passenger side of the **Green Malibu** and then exit moments later.  Based on my training and experience I recognize this behavior to be similar to how drug deals are frequently completed.

63.     Agents then followed LAMAS and the **Green Malibu** as it traveled back to the location of the **Red Accord** where it had remained parked near 67th Avenue and SE Boise Street. Det. Garland observed that this time the **Green Malibu** parked on Boise Street but several houses down from where the **Red Accord** was also parked on Boise Street.  At 4:20 p.m. Det. Garland saw LAMAS walk empty handed from the **Green Malibu** to the **Red Accord**.  Det. Garland saw the lights flash on the **Red Accord** as if LAMAS unlocked the car with a key fob as he approached the vehicle and entered the driver's door.  At 4:21 p.m. Det. Garland saw LAMAS exit from the **Red Accord** and make a motion consistent with putting something in an inside coat pocket while walking back to the **Green Malibu.**

64.     Det. Garland saw LAMAS enter the driver's door of the **Green Malibu** and depart the area.  Agents followed the **Green Malibu** back to the area of the intersection of SE 98th Avenue and SE Bush Street where the **Green Malibu** parked on 98th south of the intersection with Bush Street at 4:35 p.m.  At 4:38 p.m. SA Harron saw a pedestrian walk up to and enter the passenger side door of the **Green Malibu.**  About two minutes later, SA Harron saw the pedestrian exit the vehicle and depart the area on foot.  Agents could not see clearly

**Affidavit of Jeffrey Thomas**                                                                                                    **Page 22**

enough to determine if it was the same pedestrian that had met with LAMAS near this location earlier that afternoon. Based on my training and experience I recognize that this second meeting in the **Green Malibu** was also consistent with a drug deal.

65.    Agents continued surveillance of LAMAS and the **Green Malibu** and followed the **Green Malibu** to the Winco grocery store parking lot at the intersection of 82nd Avenue and Powell Boulevard where it remained parked until about 6:03 p.m. Agents then followed the **Green Malibu** to a Safeway parking lot where LAMAS remained in the vehicle for several minutes. As it was dark and visibility was limited, agents terminated surveillance of the **Green Malibu** at that time.

66.    During the surveillance of the **Green Malibu,** other agents had maintained surveillance of the **Red Accord** and continued this surveillance after agents stopped following the **Green Malibu.** At 6:46 p.m., SA Carr saw a sedan (later determined to be the **Green Malibu)** arrive and park near the **Red Accord** on Boise Street. SA Carr saw LAMAS exit the sedan and enter the driver's door of the **Red Accord.** At 6:48 p.m. SA Carr saw LAMAS exit the **Red Accord** and return to the sedan he arrived in. I immediately followed the sedan away from the area and confirmed that it was the **Green Malibu** based on the color of the vehicle and the license plate.

67.    Based on the surveillance conducted that day, later in the evening I coordinated for Sergeant Hogan of the Portland Police Bureau to deploy his canine partner, "Chase," on the exterior of the **Red Accord.** Sgt. Hogan's canine is trained to alert or signal to the presence/odor of heroin, methamphetamine, and cocaine.

68.    At 8:38 p.m. Sgt. Hogan and Chase arrived in the area. Chase was deployed around the vehicle and the "sniff" was concluded at 8:47 p.m. Chase did not alert to the presence

**Affidavit of Jeffrey Thomas**                                                                                    **Page 23**

of controlled substances after being deployed around the exterior of the **Red Accord**.  I know from my training and experience, combined with conversations I've had with officers trained to handle drug detection canines, that a negative alert can be attributed to the car being well sealed, current weather conditions, or how the controlled substances are packaged, among other factors, and that a negative alert does not eliminate the potential presence of controlled substances inside a vehicle.

69.     Based on the events described above, I believe there is probable cause that LAMAS used the **Green Malibu** to deliver four pieces of heroin to CS.  Furthermore, I believe there is probable cause that LAMAS used the **Green Malibu** to conduct two other drug deals near the intersection of 98th and Bush.  I also believe that based on LAMAS' comings and goings from the **Red Accord,** in conjunction with those suspected drug deliveries, that LAMAS was utilizing the **Red Accord** as a mobile drug or money stash location.  I believe that LAMAS used both the **Green Malibu** and **Red Accord** to help facilitate his drug trafficking activities that day.

**Surveillance of JORGE, LAMAS and LIBERTY DRIVER on December 18, 2018**

70.     On December 10, 2018, United States Magistrate Judge Youlee Yim You authorized the search of geolocation data for Jorge Phone 2.  The geolocation data for Jorge Phone 2 was frequently accurate to within 15 meters or less and helped agents identify **Apartment 23** as well as to determine that JORGE was the user of Jorge Phone 2.

71.     On December 18, 2018 geolocation data showed that Jorge Phone 2 was near **Apartment 23**.  Based on the geolocation data for Jorge Phone 2, SA Carr established surveillance in the area of **Apartment 23** at 9:40 a.m.  At that time SA Carr saw **Gray Camry** parked in the parking lot of the complex where **Apartment 23** is located.

**Affidavit of Jeffrey Thomas**                                                                     **Page 24**

72.     At 11:50 a.m., geolocation data for Jorge Phone 2 showed the phone had left the area of **Apartment 23** and had moved east on Farmington Road in Aloha, Oregon. At 12:06 p.m., geolocation data for Jorge Phone 2 showed the phone was located near the intersection of SW 178th Avenue and SW Wakem Street, Beaverton. At 12:10 p.m., TFO Zuniga located the **Green Malibu** parked on SW 178th Avenue near Wakem Street. This location is a short distance from the 178th Apartment.

73.     Agents followed the geolocation data for Jorge Phone 2 to the intersection of Allen Boulevard and Lombard Street in Beaverton, Oregon. At 12:40 p.m. SA Carr saw the Maroon Liberty parked in the parking lot several doors down from the San Francisco Tienda Mexican market. At 12:44 p.m. I saw JORGE and LAMAS exit from the area of the Tienda Y Carneceria Palacios grocery store which was located across Lombard from the San Francisco Market. I saw JORGE and LAMAS enter the **White Ford** and then SA Carr saw the **White Ford** drive across Lombard and park about six spaces from the Maroon Liberty.

74.     At 12:47 p.m. TFO Zuniga entered the San Francisco Market and saw JORGE, LAMAS, and LIBERTY DRIVER sitting together eating lunch. At 12:50 p.m. geolocation data for Jorge Phone 2 put the phone inside the San Francisco Market. At 1:03 p.m. a DEA Intelligence Research Specialist (IRS) placed a ruse call to Jorge Phone 2. TFO Zuniga listened to the call live and saw JORGE answer a cellphone and speak contemporaneous with the ruse call placed to Jorge Phone 2. At 1:17 p.m. SA Carr saw JORGE, LAMAS, and LIBERTY DRIVER exit from the San Francisco Market and visit briefly in the parking lot before SA Carr saw LIBERTY DRIVER enter the Maroon Liberty and JORGE and LAMAS entered the **White Ford**.

**Affidavit of Jeffrey Thomas**                                                     **Page 25**

75.    Agents followed the **White Ford** and Maroon Liberty as they traveled in tandem to a location near 8900 NE 4th Avenue in Portland, Oregon where they arrived at about 2:20 p.m. Agents terminated surveillance of that location at about 2:45 p.m.

76.    Later in the afternoon on December 18, 2018, after we terminated surveillance of JORGE, LAMAS and LIBERTY DRIVER, I drove to the intersection of SE 67th Avenue and SE Boise Street to see if the **Red Accord** was still parked there. The **Red Accord** had been moved. I searched the surrounding neighborhood and at 3:32 p.m. I found the **Red Accord** legally parked about five blocks away on SE Boise Street near the intersection with SE 62nd Avenue. Based on this surveillance I believe that someone moved the **Red Accord** from its location at 67th and Boise to diminish curiosity from neighbors and to avoid detection by law enforcement.

77.    After I found the **Red Accord**, I stopped approximately two blocks down 62nd from where the **Red Accord** was parked on Boise Street to write down some notes and review photos I had taken of the **Red Accord**. A few minutes later I saw the Maroon Liberty drive past me on 62nd Avenue traveling away from the area of the Red Accord.

78.    In early 2018, I assisted in an investigation of another heroin distribution cell operating in Portland, Oregon. That distribution cell had a similar organizational structure to the cell I am currently investigating. Both heroin cells were comprised of a dispatcher that took heroin orders over the phone and then sent a separate courier to make the delivery to the customer. During the previous investigation a courier was arrested and told agents that the group used a vehicle as a mobile drug stash location. According to this courier, the stash vehicle was regularly moved and the courier then received a phone call notifying him of the new location where the stash car was parked. Based on this information combined with surveillance of the

Red Accord as described herein, I believe the **Red Accord** is being used as a mobile drug or money stash location.

### Surveillance of JORGE, LAMAS and LIBERTY DRIVER on December 21, 2018

79.     On December 21, 2018, I conducted surveillance at **Hazel Residence** where agents have observed JORGE several times.  Based on court authorized geolocation data for phones used by JORGE, I believe that JORGE sleeps at **Apartment 23** but frequents **Hazel Residence** on a near daily basis.  LAMAS and LIBERTY DRIVER have also been observed at the **Hazel Residence** on multiple occasions.

80.     At approximately 11:30 a.m. on December 21, 2018, I saw the front door to **Hazel Residence** open and an elderly woman walked away from the residence.  I saw that the door remained open and then LAMAS leaned out of the front door holding open the screen/security door while looking around.  LAMAS then closed the door and disappeared inside the residence.

81.     At 11:41 a.m. I saw the Maroon Liberty arrive and park on the street about three houses east of **Hazel Residence**.  I saw LIBERTY DRIVER exit Maroon Liberty, walk to the passenger side and retrieve what appeared to be two plastic grocery type sacks from the Maroon Liberty and then walk to **Hazel Residence**.  I noticed that there was plenty of parking closer to the residence and recalled that we have seen other associates park a few houses away and walk to **Hazel Residence**.  I believe members of the organization park a distance away from **Hazel Residence** so that their vehicles would not lead law enforcement officers to the drug stash location.

82.     I watched as LIBERTY DRIVER walked past the front door of **Hazel Residence** and disappeared down the side yard of **Hazel Residence**.  As described below, several minutes later I saw LIBERTY DRIVER emerge from the front door of **Hazel Residence** empty handed

**Affidavit of Jeffrey Thomas**                                                                    **Page 27**

and then walk back inside the residence. I suspect that LIBERTY DRIVER entered **Hazel Residence** from a rear door to the residence.

83.     At 11:57 a.m. I saw JORGE exit from the front door of **Hazel Residence** and walk around the front yard and driveway area of the residence while he appeared to be having a conversation over a cellphone. JORGE returned to the **Hazel Residence** and then came back out a few minutes later followed by LIBERTY DRIVER. I saw JORGE and LIBERTY DRIVER crouch down and look at the front end of a Nissan Armada that was parked in the driveway of **Hazel Residence**. JORGE and LIBERTY DRIVER continued their visual examination of the vehicle for a few minutes before both men walked back to and entered **Hazel Residence**.

### Surveillance of LIBERTY DRIVER and Red Accord on January 4, 2019

84.     On December 27, 2018, agents installed a GPS tracking device on the **Red Accord** (suspected drug stash car) when it was parked in southeast Portland. On January 4, 2019, geolocation data for the **Red Accord** showed that it had been moved to the parking lot of "Crunch Fitness" located at 17800 SW Kinnaman Road in Aloha, Oregon. This location is across the street and within a few hundred yards of Apartment 208 where LIBERTY DRIVER lives. Agents responded to the area and at 11:30 a.m. SA Carr observed that the **Red Accord** was parked unoccupied. Agents maintained surveillance of the **Red Accord** and at 12:55 p.m. SA Carr saw the Maroon Liberty arrive and park on the driver's side of the **Red Accord**.

85.     SA Carr saw LIBERTY DRIVER exit the Maroon Liberty, unlock and enter the **Red Accord** and start the engine. While the **Red Accord** sat idling, SA Carr saw LIBERTY DRIVER return to passenger side of the Maroon Liberty and retrieve a small plastic bag and box from inside the Maroon Liberty. SA Carr then saw LIBERTY DRIVER return to the **Red Accord** and enter the driver's seat with the bag and box in hand. SA Carr then saw LIBERTY

**Affidavit of Jeffrey Thomas**                                        **Page 28**

DRIVER depart the parking lot in the **Red Accord**. SA Carr watched as LIBERTY DRIVER

moved the **Red Accord** approximately 200 yards down Kinnaman Road where it was then

parked on the side of the road. A few minutes later SA Carr drove by the **Red Accord** and saw

that it was no longer occupied. Agents maintained surveillance of the **Red Accord** and the

Maroon Liberty however LIBERTY DRIVER did not return to either vehicle before 3:00 p.m.

when the surveillance was terminated.

### Surveillance of LIBERTY DRIVER and Red Accord on January 7, 2019

86.     Three days later, on January 7, 2019, at 8:30 a.m., geolocation data for the **Red**

**Accord** showed it had been moved again and was located on the east side of the road near 4900

SW 180th Avenue, Aloha, Oregon. SA Carr arrived in the area and located the **Red Accord**

parked unoccupied on the side of the road. Approximately 50 yards north of the **Red Accord**,

SA Carr located the Maroon Liberty. Both vehicles were parked within a few hundred yards of

LIBERTY DRIVER's residence, Apartment 208.

87.     At 10:15 a.m., SA Carr observed LIBERTY DRIVER approach the **Red Accord**

on foot from the south. SA Carr saw the LIBERTY DRIVER start the **Red Accord** and then

reposition the vehicle further off the road but in the same area. SA Carr then observed the

LIBERTY DRIVER walk around the Maroon Liberty before entering the vehicle. SA Carr saw

the LIBERTY DRIVER drive the Maroon Liberty approximately 250 yards east before parking

the Maroon Liberty in the Crunch Fitness parking lot at 17800 SW Kinnaman Road, Aloha,

Oregon.

88.     SA Otte observed LIBERTY DRIVER exit the Maroon Liberty and proceed on

foot approximately 350 yards to the Dollar Tree Store at 17475 SW Farmington Road, Aloha,

Oregon. Minutes later, SA Otte saw LIBERTY DRIVER exit the Dollar Tree Store and walk to

**Affidavit of Jeffrey Thomas**                                                                                              **Page 29**

the Bales Farmington Market Place Grocery Store at 17675 SW Farmington Road, Aloha, Oregon arriving at 10:35 a.m. About an hour later SA Carr went to the area of a Starbucks inside the grocery store and saw the LIBERTY DRIVER sitting in the Starbucks Food Court appearing to talk on a cellphone.

**Continued Surveillance of LIBERTY DRIVER, LAMAS, and JORGE on January 7, 2019**

89.     Agents continued to watch the grocery store waiting for LIBERTY DRIVER to exit the store. At 11:35 a.m., SA Carr saw the LIBERTY DRIVER exit the Bales Farmington Market Place Grocery Store and walk east through the parking lot. At 11:45 a.m., SA Otte saw the **Green Malibu** was in the parking lot and saw LIBERTY DRIVER walk to and enter the passenger side of the **Green Malibu**. Agents then temporarily lost contact with the **Green Malibu**.

90.     Approximately 30 minutes later, SA Otte located the unoccupied **Green Malibu** in a parking lot near the HomeTown Buffet Restaurant at 3790 SW Hall Boulevard, Beaverton, Oregon. At 12:30 p.m., SA Carr observed JORGE's **Gray Camry** arrive and park near the **Green Malibu**. SA Otte observed JORGE and an unidentified Hispanic female (UF) exit the **Gray Camry** and enter the HomeTown Buffet Restaurant. Approximately 45 minutes later SA Carr observed LAMAS then JORGE, LIBERTY DRIVER, and the UF exit the HomeTown Buffet Restaurant. SA Carr saw LAMAS depart in the **Green Malibu** and JORGE, LIBERTY DRIVER and UF depart in JORGE's **Gray Camry**. Agents followed the **Gray Camry** to an Oregon Department of Motor Vehicles office and terminated surveillance a short time later.

**Identification of Apartment 23 and** Apartment 208 **on January 14, 2019**

91.     On January 14, 2019, agents utilized court authorized geolocation data for Jorge Phone 3 to conduct surveillance of JORGE, LAMAS and LIBERTY DRIVER.  Agents observed as JORGE did laundry at a laundromat and later saw JORGE, LAMAS, and LIBERTY DRIVER dining at a Denney's restaurant in northeast Portland.

92.     At 7:41 p.m. SA Carr saw **Gray Camry** arrive in the parking lot near Apartment 208.  Agents saw that the geolocation data for Jorge Phone 3 was also in that area at that time. SA Carr then saw LIBERTY DRIVER exit the passenger side of **Gray Camry** and walk towards building number 17875, where Apartment 208 is located.  SA Carr then saw LIBERTY DRIVER unlock the door and enter Apartment 208.  A few minutes later SA Carr saw JORGE depart the parking lot driving **Gray Camry.**

93.     At 7:53 p.m. I saw **Gray Camry** arrive in the parking lot of the Jefferson Square Apartments where **Apartment 23** is located. I watched as the **Gray Camry** pulled through the lot then reversed direction and drove back out the exit to 189th Avenue where it parked on the street as there were no other visitor spaces available.  A few minutes later I saw a male fitting JORGE's description, whom I believe was JORGE, walk from the direction of the **Gray Camry** carrying an armful of laundry. JORGE continued to walk towards **Apartment 23** and I walked a different parallel route in order to see where JORGE went without following directly behind him.

94.     **Apartment 23** is located in one of several duplexes situated around a small common courtyard.  At 7:55 p.m. I saw JORGE stopped in front of the door to **Apartment 23.**  I also heard noises that sounded like JORGE was attempting to open the door to **Apartment 23.** At that time JORGE paused and watched me as I walked through the courtyard and down a path towards the parking lot.  Surveillance of JORGE was then terminated.

**Affidavit of Jeffrey Thomas**                                                                 **Page 31**

**Surveillance of LIBERTY DRIVER on January 15, 2019**

95.     As described above, on the evening of January 14, 2019, SA Carr observed
LIBERTY DRIVER enter Apartment 208.  The following morning, SA Otte established
surveillance near Apartment 208.  Later that morning, SA Otte observed LIBERTY DRIVER
walk down the stairs from the area of Apartment 208 and apartment 207, the only apartments on
the second floor accessed by this stairwell.  The stairs leading to the third floor of the building
partially blocked SA Otte's view of Apartment 208; however, SA Otte observed that the door to
apartment 207 did not appear to open prior to LIBERTY DRIVER walking down the stairs and
SA Otte believes that LIBERTY DRIVER exited Apartment 208.

**Surveillance of JORGE and White Ford on January 16, 2019**

96.     On January 16, 2019, geolocation data for Jorge Phone 3 was reported in the area
of **Hazel Residence.**  Officers established surveillance near **Hazel Residence** and at about 2:20
p.m. I saw the **White Ford** depart from the area of **Hazel Residence** with chairs and refuse in
the bed of the truck.  I saw that JORGE was operating the **White Ford** and that there was a male
passenger.  I could not identify the passenger at that time as my view was limited.  Agents
maintained surveillance of the **White Ford** and followed the vehicle through Hillsboro and
eventually to the Waste Management Transfer Station located at 1525 B Street in Forest Grove,
Oregon at about 3:10 p.m.  Throughout the follow of the **White Ford** geolocation data for Jorge
Phone 3 consistently moved with the approximate location of JORGE and the **White Ford.**
Surveillance was terminated a short time after the **White Ford** arrived at the Waste Management
facility.

**Suspected Drug Delivery to Hazel Residence on January 29, 2019**

97.     On January 28, 2019, CS called JORGE at Jorge Phone 3 to discuss future drug deals.  JORGE told the CS that JORGE was expecting a new supply of drugs to arrive the next day, January 29, 2019.  As described above, on January 29, 2019, agents saw that GPS tracker data for **Green Malibu** traveled to and parked near the **Hazel Residence**.  At about 12:32 p.m. GPS tracker data for the **Green Malibu** and **Red Accord** showed that the two vehicles had departed from the area of **Hazel Residence**.  Agent's watched the GPS tracker data as **Green Malibu** and **Red Accord** traveled south on I-5 and made a few stops in the area of the I-5 and Highway 214 interchange in Woodburn, Oregon between 1:00 p.m. and 1:30 p.m.  Agents were not in position to see either vehicle during the Woodburn stops.  A short time later both vehicles began to travel north on I-5 towards Beaverton, Oregon.

98.     I established surveillance near the **Hazel Residence** at approximately 1:55 p.m. in anticipation of the **Green Malibu** and **Red Accord** returning.  At 1:56 p.m. I saw **Red Accord** turn down Hazel Street from the west traveling east.  At the same time I saw **Green Malibu** on Hazel Street approaching **Hazel Residence** from the east.  The **Red Accord** drove past **Hazel Residence** and disappeared from my view.  About this same time, I saw **Green Malibu** turn in to the driveway of **Hazel Residence** then reverse course and depart east on Hazel Street in the same direction that **Red Accord** had traveled.

99.     A few minutes later GPS data for the **Red Accord** showed the car was parked up the street to the west of my location where it had a view of my vehicle.  I saw that the **Red Accord** was parked with its headlights on and that it appeared to be occupied twice.  Several minutes later the **Red Accord** traveled east on Hazel Street past my location.  The **Red Accord** made a U-turn and parked across the street from my vehicle.  I saw LAMAS exit the passenger

door of the **Red Accord** and stand there waiting for JORGE. I saw JORGE exit the driver's door and then walk in a loop from the **Red Accord** around my vehicle then return to the area of the **Red Accord.** I saw that JORGE appeared to be studying my vehicle. I don't know what stood out to JORGE about my vehicle but I believe he was suspicious that it could be a law enforcement vehicle.

100.    JORGE then walked a few houses to the east and walked up the driveway for **Hazel Residence.** As JORGE walked to the **Hazel Residence**, I saw LAMAS walk east passed **Hazel Residence** then disappear down the street out of my view. At 2:22 p.m. I saw the **Green Malibu** pull into the driveway of **Hazel Residence.** At 2:23 p.m. I saw LAMAS walking from the area of **Green Malibu** carrying a backpack over his shoulder. I watched as LAMAS passed the front door to **Hazel Residence** and then disappeared from my view at the side yard of **Hazel Residence.** At 2:24 p.m. I saw the **Green Malibu** depart from **Hazel Residence.** Based on GPS tracker data the **Green Malibu** traveled part way around the block and parked near the intersection of SW Berthold Avenue and SW Brendon Ct.

101.    At 2:30 p.m. I saw LAMAS walking east on Hazel Street from the area of where the **Green Malibu** had been parked and then disappear from my view near the driveway for **Hazel Residence.**

102.    Based on this surveillance combined with the CS' phone call with JORGE the day before, I believe that JORGE and LAMAS traveled to the Woodburn area in separate vehicles in order to obtain a new supply of drugs. I believe that JORGE intentionally separates himself from the actual drugs in order to thwart law enforcement investigation and diminish his risk of being arrested. I believe that JORGE followed LAMAS to act as counter surveillance or to make sure that the pickup of the new supply of drugs went as planned.

**Affidavit of Jeffrey Thomas**                                              **Page 34**

103.    I believe that something about my vehicle caused JORGE or LAMAS concern

when they returned to the area of the **Hazel Residence**.  I believe that the **Green Malibu** had the

drugs inside and that LAMAS parked it away from **Hazel Residence** before JORGE drove the

**Red Accord** to LAMAS' location and picked LAMAS up.  I believe that JORGE then drove the

**Red Accord** to the location where they could watch my vehicle and Hazel Street in effort to

detect the presence of law enforcement.  I believe that JORGE and LAMAS intentionally

avoided the **Hazel Residence** until they had assuaged their concerns about my vehicle.  I believe

that when I saw LAMAS carry a backpack from the area of the **Green Malibu** past the front

door to **Hazel Residence** and then disappear down the side yard of **Hazel Residence** that

LAMAS was likely moving the new supply of drugs from the **Green Malibu** to wherever they

store the drugs at **Hazel Residence.**

### Other Surveillance and Examination of Trash

104.    During the investigation, other officers and I have conducted surveillance on

JORGE, LAMAS and LIBERTY DRIVER on multiple occasions.  As described herein,

following the first controlled purchase, I believe LAMAS used **Green Malibu** and **Red Accord**

to facilitate additional drug deliveries based on our surveillance.  However, during other

surveillance operations, officers did not witness any activity that appeared to involve the

distribution of drugs, other than the descriptions provided in this affidavit.  It is noted that on

several occasions officers observed the target subjects enter or exit locations where surveillance

officers were unable to conduct surveillance without concern of being spotted.  Additionally,

officers conducted most of the surveillance during daylight hours and did not focus significant

surveillance efforts later at night.

105.    On January 10, 2019, other officers and I examined the discarded trash and recycling bin at **Hazel Residence**.  Officers did not locate any items of evidentiary value pursuant to this examination.

## IDENTIFICATION OF RESIDENCES

### JORGE's Residence: Apartment 23

106.    As described herein, we have utilized CS to conduct three controlled purchases of drugs that were all coordinated over the phone by JORGE.  In November and December 2018 CS arranged to purchase four pieces of heroin on two separate occasions.  In January 2019 CS called JORGE who arranged the delivery of a pound of suspected methamphetamine.  Based on these controlled purchases I believe that JORGE is the dispatcher or director of a heroin and methamphetamine distribution group.

107.    We have utilized court authorized geolocation data for cell phones used by JORGE in combination with physical surveillance to determine that JORGE lives at **Apartment 23.**  Although I did not see JORGE go into **Apartment 23** on January 14, 2019, I believe that he was intending to enter **Apartment 23** until he noticed my presence.  I believe that this surveillance combined with geolocation data for phones used by JORGE consistently being located in the area of **Apartment 23** during the night, JORGE's primary vehicle (**Gray Camry**) consistently being parked near **Apartment 23,** and other surveillance of JORGE coming and going from the area of **Apartment 23,** I believe that JORGE lives at **Apartment 23**.  The utilities at **Apartment 23** are subscribed to a Hispanic female.  At this time we have not identified any connection between the utility subscriber and JORGE.

108.    Based on this investigation, I believe that JORGE is involved in distributing heroin and methamphetamine.  I believe that JORGE lives at **Apartment 23.**  Based on my

**Affidavit of Jeffrey Thomas**                                                              **Page 36**

training and experience, I know that it is common for drug traffickers to maintain items of evidentiary value, including controlled substances, cell phones, drug ledgers, firearms, currency and other items where they live. I believe that evidence of JORGE's drug trafficking activities will be located at **Apartment 23**, and that specifically Jorge Phones 1, 2, and 3 as well as documented government funds, used to purchase heroin and methamphetamine from JORGE and LAMAS, will be located at JORGE's residence or in his vehicles, including **Gray Camry**, **White Ford**, and **Red Accord**.

### Hazel Residence – Suspected Drug Stash Location

109.    Beginning with the first heroin buy on November 9, 2019, through surveillance we have observed JORGE and his co-conspirators, to include LAMAS and LIBERTY DRIVER, coming and going from the **Hazel Residence** on numerous occasions. I have conducted surveillance of the **Hazel Residence** several times. The person I have most commonly seen at this residence is JORGE, the person that coordinates the drug deliveries for this drug trafficking organization. As previously described, I believe that the pound of methamphetamine LAMAS delivered to CS on January 18, 2019, was picked up at **Hazel Residence** immediately before the delivery to the CS.

110.    As described herein, based on JORGE's statement to CS that he expected a new supply of drugs on January 29, 2019, combined with the surveillance of JORGE and LAMAS on January 29, 2019, I believe that JORGE and LAMAS obtained a new supply of drugs and brought it back to the **Hazel Residence** to be stored pending distribution.

111.    From previous surveillance operations I have driven through the apartment complex that is located across the back fence of **Hazel Residence.** From this view I have observed a storage shed that is located within the fenced yard behind **Hazel Residence.** As

**Affidavit of Jeffrey Thomas**                                                                                  **Page 37**

described herein, On December 21, 2018, I saw LIBERTY DRIVER carry two grocery type bags past the front door to **Hazel Residence** and then disappear down the side yard of **Hazel Residence** as did LAMAS with the backpack on January 29, 2019. Based on these observations I believe that LAMAS and LIBERTY DRIVER entered **Hazel Residence** from a back door and that they potentially secured the bags they carried in the shed behind **Hazel Residence**. I believe that the search of **Hazel Residence** and the shed behind **Hazel Residence** will locate evidence of drug trafficking activity to include drugs, packaging materials, residue of drugs, firearms and or currency.

## IDENTIFICATION OF VEHICLES

### Gray Camry – JORGE's Car

112.    As described herein, agents have observed JORGE operating the **Gray Camry** on several occasions. Every time we have seen the **Gray Camry** used, JORGE has been the driver. Based on my training and experience, I know that it is common for drug traffickers to maintain items of evidentiary value, including controlled substances, cell phones, drug ledgers, firearms, currency and other items in their vehicles. I believe a search of the **Gray Camry** will locate evidence of JORGE's drug trafficking activities, specifically the telephones used by JORGE to arrange the controlled purchases of heroin and methamphetamine with CS.

### White Ford – JORGE's Truck

113.    As described herein, agents have observed JORGE operating the **White Ford** on several occasions. Every time we have seen the **White Ford** used, JORGE has been the driver. Based on my training and experience, I know that it is common for drug traffickers to maintain items of evidentiary value, including controlled substances, cell phones, drug ledgers, firearms, currency and other items in their vehicles. I believe a search of the **White Ford** will locate

**Affidavit of Jeffrey Thomas**                                                                 **Page 38**

evidence of JORGE's drug trafficking activities, specifically the telephones used by JORGE to arrange the controlled purchases of heroin and methamphetamine with CS.

### Green Malibu – LAMAS' Vehicle

114.    I believe that LAMAS is a heroin and methamphetamine courier. As described herein, agents have observed LAMAS operating the **Green Malibu** on several occasions including the December 2018 delivery of suspected heroin to CS and the January 2019 delivery of suspected methamphetamine to CS. I know from my training and experience that it is common for drug traffickers to maintain items of evidentiary value, including controlled substances, cell phones, drug ledgers, firearms, currency and other items in their vehicles. I believe a search of the **Green Malibu** will locate controlled substances, telephones used by LAMAS, U.S. currency, and other items of evidentiary value related to LAMAS' drug trafficking activities.

### Red Accord – Mobile Stash Location

115.    As described herein, the **Red Accord** was initially identified as a believed drug stash location on December 13, 2018, after LAMAS delivered heroin to CS and then repeatedly accessed the **Red Accord** in conjunction with what appeared to be two other drug deals. On December 26, 2018, United States Magistrate Judge Youlee Yim You authorized the installation of a GPS tracking device on **Red Accord**. On December 27, 2018, agents installed a GPS tracking device on the **Red Accord**. Since that first surveillance, agents have seen LIBERTY DRIVER start and move **Red Accord** on several occasions and move a box from the Maroon Liberty and place it in the **Red Accord** during one of those surveillances.

116.    On January 23, 2019, I observed the **Red Accord** parked in a visitor space in the parking lot where JORGE's apartment, **Apartment 23**, is located. Around that time, data from

**Affidavit of Jeffrey Thomas**                                                        **Page 39**

the GPS tracking device showed the vehicle traveled to northeast Portland on a few different occasions.

117.    As previously described, I believe that JORGE drove the **Red Accord** on January 29, 2019, when I suspect that JORGE followed LAMAS to obtain a new supply of drugs and then return to the **Hazel Residence**.   Later that afternoon GPS tracker data for the **Red Accord** showed that the **Red Accord** was driven and parked in the area of 2790 SE 81st Avenue in Portland, Oregon at 5:32 p.m. and remained there overnight.  I believe that JORGE and LAMAS may have resupplied the drug stash car, the **Red Accord,** and deployed it at another location in southeast Portland as they did when we first saw the **Red Accord** being accessed by LAMAS in east Portland in December 2018.

118.    Based on the surveillance of LAMAS, LIBERTY DRIVER and the recent use of the **Red Accord** described herein, I believe the **Red Accord** continues to be used in support of the drug trafficking activities of JORGE, LAMAS, and LIBERTY DRIVER and will contain evidence of that activity, to include drugs, packaging materials, residue of drugs, traps/compartments, and or currency.

### KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

119.    Based upon my training and experience, and conversations with, and training from, other officers and agents involved in drug investigations, I know the following:

a.    Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug

traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes and vehicles.

b.      Traffickers of controlled substances commonly maintain records such as telephone numbers of their suppliers, customers and associates in the trafficking organization and it is common to find drug traffickers keeping records of said associates in cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement and it is common for traffickers to use more than one cellular telephone at any one time. Traffickers often retain previously-used cellular telephones for a period of time after they discontinued using the telephones.

c.      Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences and vehicles. This evidence often includes more than contraband and paraphernalia and includes financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes.

d.      Traffickers frequently maintain items necessary for weighing, packaging and cutting drugs for distribution. This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

e.      Traffickers frequently maintain records, books, notes, ledgers, and other papers relating to the transportation and distribution of controlled substances in locations convenient to them, such as their residences and vehicles.

f.      Traffickers often maintain weapons, including guns and ammunition, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

**Affidavit of Jeffrey Thomas**        **Page 41**

g.      Traffickers often have false identification documents and identification documents in the names of others.

h.      Drug trafficking is a cash business and in order to escape notice from authorities for using unexplained income, or hide excessive cash from illegal activities, traffickers either keep large quantities of cash at home or other secure locations, or convert cash into other valuable assets, such as jewelry, monetary instruments, or other negotiable forms of wealth. Records of such conversions are often stored where a trafficker lives.

**Electronically Stored Information**

120.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Premises**, in whatever form they are found.  One form in which the records will likely be found is data stored on a computer's hard drive, on other storage media, or other digital devices, including cell phones (hereinafter collectively referred to as digital devices).  Thus, the warrant applied for would authorize the seizure of electronic storage media or the copying of electronically stored information, all under Rule 41(e)(2)(B).

121.    There is probable cause to believe, and I do believe, that records will be stored on a digital device because, based on my knowledge, training, and experience, I know that drug traffickers/distributors often communicate with their associates using cellular telephones. I am also aware that drug traffickers/distributors often change cellular telephones as a means to evade detection by law enforcement. Furthermore, I have learned in my training that large-scale drug traffickers/distributors often will utilize several cellular phones, including prepaid phones, as a method to compartmentalize their drug trafficking/bulk cash activities and as a means to evade detection by law enforcement. Furthermore, I have learned that drug traffickers and distributors often create fictitious names and addresses on their personal cell phones as well to avoid

**Affidavit of Jeffrey Thomas**                                                    **Page 42**

detection by law enforcement.  The information described below I have learned through my training and experience to include information learned from the United States Attorney's Office as it relates to electronically stored information.

a.      Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data. Therefore, deleted files or remnants of deleted files, may reside in free space or slack space— that is, in space on the digital device that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.      Wholly apart from user-generated files, digital devices—in particular, internal hard drives—contain electronic evidence of how a digital device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Digital device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

c.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

**Affidavit of Jeffrey Thomas**                                                        **Page 43**

d.      Based on actual inspection of other evidence related to this investigation, including intercepted wire communications, I am aware that digital devices were used to facilitate the DTO's drug trafficking scheme. Thus, there is reason to believe that there is a digital device currently located on the Premises.

122.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant but also for forensic electronic evidence that establishes how digital devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any digital device in the Premises, because, based on my knowledge, training, and experience, I know:

a.      Data on the digital device can provide evidence of a file that was once on the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the digital device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on a digital device can also indicate who has used or controlled it. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files,

**Affidavit of Jeffrey Thomas**                                                                     **Page 44**

user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time.  Further, forensic evidence on a digital device can show how and when it was accessed or used.  Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation.  This "timeline" information may tend to either inculpate or exculpate the user of the digital device.  Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

      c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed

**Affidavit of Jeffrey Thomas**                                                     **Page 45**

along to investigators. Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

123.    In most cases, a thorough search of the Premises for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant. In lieu of removing a digital device from the Premises, it is sometimes possible to image or copy it. Generally speaking, imaging is the taking of a complete electronic picture of the digital device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction. This is true because:

a.      As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine digital devices to obtain evidence. Digital devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months,

**Affidavit of Jeffrey Thomas**                                                    **Page 46**

depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools. Similarly, digital devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the digital device off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

124.    *Nature of the examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

125.    The initial examination of the digital device will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant. The government shall complete this review within 180 days of the date of execution of

**Affidavit of Jeffrey Thomas**                                                           **Page 47**

the warrant. If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

126. If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the digital device do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

127. If an examination is conducted, and the digital device does not contain any data falling within the ambit of the warrant, the government will return the digital device to its owner within a reasonable period of time following the search and will seal any image of the digital device, absent further authorization from the Court.

128. The government may retain the digital device as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the digital device and/or the data contained therein.

129. The government will retain a forensic image of the digital device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Affidavit of Jeffrey Thomas**                                    **Page 48**

## CONCLUSION

130.    Based on the information described herein, I believe that we have obtained
sufficient evidence to show that JORGE, LAMAS, and LIBERTY DRIVER, among others, are
involved in drug trafficking in the District of Oregon.  As described herein, through CS, agents
have purchased four pieces of heroin coordinated by JORGE and delivered by LAMAS.
Additionally, I believe that LIBERTY DRIVER gave LAMAS the pound of methamphetamine
that LAMAS then delivered to CS, and that this transaction was also coordinated by JORGE.

131.    This affidavit also provides details to support my belief that each of the locations
described herein is used by the subjects as their primary residences and/or locations to store
drugs.  This affidavit also provides details regarding vehicles used by the target subjects, both to
facilitate drug trafficking and as their primary vehicles.

132.    Based on my training and experience, I believe it is common for drug traffickers
to maintain ready access to their drugs so as to be able to sell to customers on short notice.  I
know it is also common for drug traffickers to maintain other items used in the distribution of
drugs, such as scales and packaging materials and cutting/diluting agents.

133.    Based on my training and experience, I know that it is also common for drug
traffickers to maintain other items of evidentiary value, including cell phones, drug ledgers,
firearms, currency and other items, such as documents related to bank accounts, vehicle and/or
property ownership or property rentals including safe deposit boxes and storage units.  These
items are often kept in residences and vehicles used by the drug traffickers.  As described in
detail herein, the subjects of this investigation have used their cellphones to facilitate the
commission of the target offenses.  Many of the subjects have used multiple phones during the

**Affidavit of Jeffrey Thomas**                                                                    **Page 49**

wiretap phase of the investigation. These cell phones, including phones that the subjects have discontinued using, can be of evidentiary value.

134.    Based on the facts provided in this affidavit, I believe there is probable cause that evidence described in Attachment B will be found inside the locations and vehicles described in Attachment A.

135.    I have discussed this affidavit and its contents with Assistant United States Attorney Thomas H. Edmonds. AUSA Edmonds advised me that, in his opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrants.

JEFFREY THOMAS
Special Agent, Drug Enforcement Administration

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at
3:34 a.m/p.m. on January 31, 2019.

HONORABLE JOHN V. ACOSTA
UNITED STATES MAGISTRATE JUDGE

**Affidavit of Jeffrey Thomas**                                                **Page 50**